IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAUN A. BURBA, | ) | CASE NO. 1:19-cv-00905 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Shaun A. Burba (Plaintiff" or "Burba") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has

been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

On September 24, 2017, Burba protectively filed applications for DIB and SSI.[1]  Tr. 12,

280-291.  Burba initially alleged a disability onset date of August 11, 2017, but later amended

his alleged onset date to March 8, 2107.  Tr. 12, 52.   He alleged disability due to having been in

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 5/1/2020).

speech classes; lower disk problem in back, acid reflux disease, broken knee, broken leg, broken foot, arthritis and depression. Tr. 85-86, 161, 168, 177, 184. After initial denial by the state agency (Tr. 161-174) and denial upon reconsideration (Tr. 177-188), Burba requested a hearing (Tr. 189-190). On November 27, 2018, a hearing was held before an Administrative Law Judge ("ALJ"). Tr. 47-84.

On December 20, 2018, the ALJ issued a decision unfavorable to Burba (Tr. 9-31), finding that he had not been under a disability within the meaning of the Social Security Act from March 8, 2017, through the date of the decision (Tr. 13, 25-26). Burba requested review of the ALJ's decision by the Appeals Council. Tr. 277-279. On February 20, 2019, the Appeals Council denied Burba's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-8.

## II. Evidence

### A. Personal, educational, and vocational evidence

Burba was born in 1978. Tr. 24. He has a high school education. Tr. 55. Following high school, Burba started working as a machinist, being trained and working as a diamond cutter. Tr. 55-57. Burba last worked in August 2017. Tr. 58. Burba lives with his brother. Tr. 57.

### B. Medical evidence

#### 1. Treatment history

On April 8, 2015, Burba had surgery to repair lateral compartment chondral damage and a lateral meniscus tear in his right knee. Tr. 364. Dr. J. Martin Leland, III, M.D., performed the surgery. Tr. 364. The surgery involved right knee arthroscopy, partial lateral meniscectomy, and lateral compartment microfracture. Tr. 364.

Upon Dr. Leland's referral, on August 5, 2015, Burba saw William Ervine, D.O. for right knee pain and low back pain.  Tr. 371.  Dr. Ervine noted that Burba reported still having a lot of pain in his right knee that was described as sharp, dull, and achy and 8/10.  Tr. 371.  Burba was having swelling in his right knee and it occasionally locked up or gave out on him.  Tr. 371. Tramadol did not help.  Tr. 371.  Dr. Ervine's diagnoses included knee pain and osteoarthritis of the knee.  Tr. 373.  Dr. Ervin started Burba on Hydrocodone-Acetaminophen, Voltaren gel, and prescribed a disability placard with an expiration date of August 2020, noting that Burba was unable to walk 200 feet without stopping.  Tr. 373.  Dr. Ervine advised Burba to keep his leg elevated whenever he could to decrease the swelling and increase the circulation.  Tr. 373.

On December 14, 2015, Burba saw Dr. Ervine for follow up regarding his leg.  Tr. 368. Burba relayed that his right knee pain was okay – he was wearing a copper brace.  Tr. 368.  But he was still having occasional swelling in his knee; it was better with rest, pain medication, and Voltaren gel; and worse with too much walking.  Tr. 368.  On physical examination, Dr. Ervine observed tenderness to palpation over the medial right knee with swelling; normal range of motion; abnormal stability; some laxity with varus stress of right knee; and normal muscle strength/tone.  Tr. 369.  Dr. Ervine renewed Burba's prescription for Hydrocodone-Acetaminophen and he recommended that Burba apply warm packs or a heating pad to his knee for pain.  Tr. 369.

On March 11, 2017, Burba saw Mark Mendeszoon, DPM, for right foot pain after falling down some stairs three days earlier.  Tr. 398.  Burba was seen at an urgent care and informed he had a chip fracture.  Tr. 398.  Burba was using crutches and a splint.  Tr. 398.  Burba reported a prior history of a break in his right leg.  Tr. 398.  Dr. Mendeszoon noted that x-rays showed a significant fracture of the second metatarsal proximally and questionable third fourth metatarsal

fractures.  Tr. 398.  Dr. Mendeszoon ordered a CAT scan to get a better understanding of the fractures.  Tr. 398.  Dr. Mendeszoon advised Burba to use Ace wraps and a removable walking boot; elevate and ice his foot; use standard crutches; and follow up after the CAT scan.  Tr. 398.

After having the CAT scan performed, Burba saw Dr. Mendeszoon for follow up on March 16, 2017.  Tr. 406.  Burba was using his walking boot and ice.  Tr. 406.  Dr. Mendeszoon advised Burba that the scan showed significant metatarsal proximal fracture 1, 2, 3, and 4 that were intra-articular.  Tr. 406.  The impression was severe right foot proximal metatarsal fractures and right ligament disruption.  Tr. 406.  Dr. Mendeszoon recommended surgery for Burba's foot and advised Burba that it could take a full year to recover and he will never be 100%.  Tr. 406.

Burba also saw Dr. Ervine on March 16, 2017, for follow up regarding his leg and for refills.  Tr. 459.  Burba relayed that he had broken his foot and was scheduled to have surgery.  Tr. 459.  Burba relayed that his knee pain was flaring up and was worse with walking and standing a lot.  Tr. 459.  He reported no numbness or weakness.  Tr. 459.  On examination, Dr. Ervine noted tenderness to palpation over the medial side and anterior portion of the right knee; Burba was in a walking boot and using crutches; abnormal range of motion; crepitus in the right knee; normal stability; and normal muscle strength/tone.  Tr. 461.  Dr. Ervine renewed Burba's Hydrocodone-Acetaminophen; advised him to eat foods high in calcium and get 400 IU of Vitamin D daily for his osteoarthritis; and advised him he could apply low to medium heat using a heating pad.  Tr. 461.

On March 22, 2017, Dr. Mendeszoon performed surgery on Burba's right foot for right mid-foot fractures metatarsals 1, 2, 3, and 4 and Lisfranc right foot injury.  Tr. 392-393.  The surgery involved right mid-foot fractures open reduction and internal fixation and stabilization of

the Lisfranc joints metatarsals 2, 3, and 4, and stabilization of the Lisfranc ligaments with internal fixation.  Tr. 392.

At a follow-up visit on March 27, 2017, Burba relayed that he was doing okay but still having pain especially at night.  Tr. 410.  Dr. Mendeszoon instructed Burba to continue to use his walking boot and crutches for the next couple of weeks.  Tr. 410.

During an April 13, 2017, follow-up visit with Dr. Mendeszoon, Burba reported that he had good and bad days.  Tr. 412.  Burba's foot looked a little swollen.  Tr. 412.  Burba was wearing his boot all the time, using one crutch, and taking Hydrocodone.  Tr. 412.  Burba was advised to continue using crutches and the boot, elevating and icing, and non-weightbearing range of motion.  Tr. 412.

Burba saw Dr. Mendeszoon on May 11, 2017, for follow up.  Tr. 416.  Burba relayed that he had weaned himself off the boot and was walking in his tennis shoe.  Tr. 416.  Burba was still having pain that was waking him up at night.  Tr. 416.  He was taking Norco a few times each day.  Tr. 416.  Burba indicated he wanted to return to work on May 26, 2017, with light duty restrictions.  Tr. 416.  Dr. Mendeszoon advised Burba that he should continue to use his boot for increased activity and an ASO ankle brace with his shoe.  Tr. 416.  Also, Burba was advised to continue icing, follow up in 6 weeks, and start physical therapy at home.  Tr. 416.  On that same date, Dr. Mendeszoon wrote a letter indicating that Burba had been under his care and was able to return to work on May 26, 2017.  Tr. 394.  Dr. Mendeszoon requested that Burba be allowed to return to work for light duty.  Tr. 394.

On June 6, 2017, Burba saw Dr. Ervine for follow up and medication refills.  Tr. 452.  Burba relayed that he had surgery in March 2017 and he was slowly getting better but his foot and ankle pain was still bad and his 2nd through 4th toes were a little darker than the others.  Tr.

452.  Burba reported some numbness on the top of his foot and decreased ability to bend his toes.

Tr. 452.  He was having some pain on the inside of his right knee that had worsened since his

foot injury.  Tr. 452.  His knee pain was worse with walking and standing and better when

staying off it and taking Vicodin.  Tr. 452.  Burba did not have swelling or bruising in his right

knee.  Tr. 452.  On physical examination, Dr. Ervine noted that Burba's gait and station were

abnormal; he had tenderness to palpation over the medial side of his right knee and over the

dorsal surface of his right foot around the 2nd to 4th toes; abnormal range of motion; crepitus in

the right knee; normal stability; and normal muscle strength/tone.  Tr. 454.   Burba's deep tendon

reflexes were 2+ and symmetric and his sensation was normal.  Tr. 454.  Burba appeared anxious

and in pain.  Tr. 454.

Burba saw Dr. Mendeszoon on June 22, 2017.  Tr. 419.  Burba relayed that he had been

at work and his foot was starting to hurt more and more.  Tr. 419.  He was wearing his brace but

he was on his foot more than he had been.  Tr. 419.  Burba had mild diffuse edema of the right

foot; some discomfort in the tarsometatarsal joint region; minimal swelling (although Dr.

Mendeszoon noted it was early in the morning); and a slight antalgic gait.  Tr. 419.  Dr.

Mendeszoon noted that x-rays showed that Burba's "hardware is stable to stress reaction fracture

appears to be consolidating on the fourth metatarsal [and] . . . other fractures appear to be

healed."  Tr. 419.  Dr. Mendeszoon started Burba on a TENS unit to help to modulate his pain

and swelling.  Tr. 419.  Dr. Mendeszoon advised Burba to use the TENS unit twice each day and

provided Burba with a prescription for Hydrocodone to be used as necessary until he saw his

pain management doctor.  Tr. 419.

Burba saw Dr. Mendeszoon on July 20, 2017, for a follow-up visit.  Tr. 423.  Burba

reported significant pain and swelling and requested pain medication.  Tr. 423.  Burba had an

ASO brace and was working three shifts each week. Tr. 423. An antalgic gait was noted and Burba had discomfort in the Lisfranc joint region. Tr. 423. Dr. Mendeszoon felt Burba was a good candidate for custom orthotic devices and orthotic scanning was done. Tr. 423. Dr. Mendeszoon provided a prescription for pain medication but noted that Burba would have to then follow with his medical doctor. Tr. 423. The assessment was secondary osteoarthritis, right ankle and foot and nondisplaced fracture of second metatarsal bone, right foot, initial encounter for closed fracture. Tr. 423. Dr. Mendeszoon advised Burba to continue with home therapy, stretching, exercises, and icing. Tr. 423.

Burba followed up with Dr. Mendeszoon on August 3, 2017. Tr. 425. Dr. Mendeszoon advised Burba to continue with home physical therapy, stretching, exercise, icing and medication as necessary and to return in two weeks to pick up his custom orthotic device. Tr. 425. Burba was requesting Vicodin but Dr. Mendeszoon was unable to write Burba a prescription for pain medication, indicating Burba needed to see his primary care physician if he wanted pain medication. Tr. 425.

Burba saw Dr. Ervine on November 27, 2017, with complaints of depression, leg pain, and foot pain. Tr. 447. Burba relayed that he was having a lot of pain in his right knee and foot. Tr. 447. His pain was worse with a lot of standing or walking and was better when lying down and when taking Ibuprofen. Tr. 447. Burba reported that he always had swelling around his knee when walking on it. Tr. 447. He had some numbness over the tips of his toes and over his lateral right knee. Tr. 447. His knee gave out at times but did not lock up; his ankle did not lock up or give out. Tr. 447. Burba had applied for disability and he had seen pain management who recommended that he follow up with ortho. Tr. 447. Burba reported being depressed and sad. Tr. 447. On examination, Dr. Ervine observed that Burba's gait and station were abnormal with

limping on the right; he exhibited tenderness to palpation on lateral right knee and dorsal surface of the right foot around the 2nd through 4th toes; his range of motion was abnormal; he had crepitus in the right knee; his stability, muscle strength/tone, and sensation were normal.  Tr. 449.  Dr. Ervine described Burba's mood and affect as anxious.  Tr. 449.  Dr. Ervine wrote a prescription for a cane on November 27, 2017.  Tr. 528.

On December 12, 2017, Burba had an x-ray of his right knee.  Tr. 545.  It showed lateral plate and screw fixation and anterior screw fixation of the tibia and no acute fracture or dislocation.  Tr. 545.  On December 20, 2017, Burba had an MRI of the right knee that showed mild tricompartmental degenerative changes and mild atrophy possibly related to disuse.  Tr. 543-544.

On May 24, 2018, Burba saw Dr. Ervine for follow up and medication refills.  Tr. 508. Burba relayed that "every day [was] a struggle."  Tr. 508.  He indicated that the pain in his right foot and knee were worsening which made him feel very helpless.  Tr. 508.  He was struggling financially since losing his job and was applying for disability.  Tr. 508.  He reported symptoms of depression.  Tr. 508.  He was having difficulty concentrating and felt "zoned out" a lot.  Tr. 508.  His energy, appetite, and sleep had been poor.  Tr. 508.  He was concerned about weight gain, having gained 20 pounds since his last visit in March- he was having a hard time exercising because of his knee and foot pain and he usually only ate one meal a day due to decreased appetite.  Tr. 508.  Burba reported having intermittent numbness and tingling of his left forearm and hand for the past month.  Tr. 508.  On physical examination, Dr. Ervine observed an abnormal gait and station, with limping on the right; tenderness to palpation over medial side of right knee and dorsal surface of right foot around the 2nd-4th toes; abnormal range of motion;

crepitus in right knee; normal stability; normal muscle strength/tone; and an anxious and sad mood and affect.  Tr. 511.

On July 26, 2018, Burba saw Dr. Ervine for follow up.  Tr. 519.  Burba relayed that he had fallen a few times over the prior month and injured his ribs.  Tr. 519.  He was really sore and he was in a lot of pain.  Tr. 519.  His pain was better with Ibuprofen and worse with moving or deep breathing.  Tr. 519.  Burba reported some dizziness when he moved quickly.  Tr. 519.  His right knee occasionally gave out.  Tr. 519.  He was sleeping poorly because of the pain but Trazadone helped him sleep.  Tr. 519.  On examination, Burba exhibited tenderness to palpation in lateral portion of ribs 6 through 10; an abnormal gait and station with limping on the right; tenderness to palpation over the right knee and foot; decreased range of motion of left ribs; crepitus in right knee; normal stability; normal muscle strength/tone; normal sensation; and his mood and affect was anxious and he was in pain.  Tr. 521.  Dr. Ervine noted that Burba had a follow-up with pain management scheduled for epidurals to try to help Burba with his leg and back pain so that they could get Burba functional.  Tr. 523.

### 2.  Opinion evidence[2]

#### *Treating source*

On June 28, 2018, Dr. Ervine completed two medical forms: (1) a Medical Statement – Physical Limitations/Mental Abilities form (Tr. 514-515); and (2) an Off-Task/Absenteesim Questionnaire (Tr. 516).   And, on July 27, 2018, Dr. Ervine completed a Medical Source Statement – Hand Held Assistive Device.  Tr. 525.

---

[2] The mental health impairment opinions are not summarized herein because they are not pertinent to the analysis herein.

*Medical Statement – Physical Limitations/Mental Abilities form*

In the Medical Statement – Physical Limitations/Mental Abilities form, Dr. Ervine indicated that, from August 11, 2017, through present, Burba's diagnoses included complex regional pain syndrome (right leg), knee pain, and osteoarthritis of the knee.  Tr. 514.  He opined Burba could work 4 hours total per day; stand for less than 15 minutes at one time and stand for up to 2 hours total during a workday; sit for 15 minutes at one time and sit for up to 6 hours total during a workday; lift up to 10 pounds occasionally and no more than 5 pounds frequently; never stoop or balance; bend occasionally; occasionally work around dangerous equipment and tolerate cold; frequently operate motor vehicle, tolerate heat, tolerate dust, smoke or fumes, or noise; and never tolerate heights.  Tr. 514.  Dr. Ervine opined Burba would need to frequently elevate his legs above waist level in an 8-hour workday.  Tr. 514.  He opined that Burba suffered from pain that was severe.  Tr. 514.  Dr. Ervine anticipated that Burba would be absent from work more than three times a month due to his impairments and/or treatment.  Tr. 515.

*Off-Task/Absenteeism Questionnaire*

In the Off-Task/Absenteeism Questionnaire, Dr. Ervine opined that Burba would likely be off-task at least 20% of the time (exclusive of 1/2 lunch break and two 15-minute breaks) due to complex regional pain syndrome, generalized anxiety, inability to concentrate due to pain, and pain in the right knee and leg.  Tr. 516.  Dr. Ervine anticipated that Burba's impairments or treatment would cause Burba to be absent from work about 4 times each month.  Tr. 516.  Dr. Ervine indicated that the severity of Burba's impairment had lasted since at least August 11, 2017.  Tr. 516.

10

_Medical Source Statement – Hand Held Assistive Device form_

In the Medical Source Statement – Hand Held Assistive Device form, Dr. Ervine opined that, from March 3, 2017, through the present, it was medically necessary for Burba to use a hand-held assistive device for walking and standing.  Tr. 525.  Dr. Ervine opined that the type of assistive device that Burba needed was a single-prong cane.  Tr. 525.

### _State agency consultants_

On January 13, 2018, state agency consultant Gary Hinzman, M.D., completed a physical RFC Assessment.  Tr.  95-97.  Dr. Hinzman opined that Burba was limited to occasionally lifting, carrying, pushing, and pulling 20 pounds and 10 pounds frequently; limited to standing and/or walking for about 6 hours and sitting for about 6 hours out of an 8-hour day; limited to occasionally climbing ladders/ropes/scaffolds; frequently climbing ramps/stairs, kneeling, crouching, and crawling; and would have to avoid concentrated exposure to hazardous machinery and unprotected heights.  Tr. 95-97.  Dr. Hinzman explained that the limitations were due to osteoarthritis of the right knee.  Tr. 95-97.

Upon reconsideration, on May 9, 2018, a state agency medical consultant Theresa March, D.O., affirmed Dr. Hinzman's RFC findings.  Tr. 132-34.  Dr. March explained that the limitations were due to osteoarthritis of the right knee as well as right foot fixation.  Tr. 132-134.

Both Drs. Hinzman and March noted that Burba had a lower extremity fracture that was not expected to last. Tr. 96, 133.

**C.**   **Hearing testimony**

**1.**   **Plaintiff's testimony**

Burba testified and was represented at the hearing.  Tr. 49, 55-77.  Burba testified that his brother was living with him and his brother took care of everything – the cooking, cleaning, and washing clothes.  Tr. 57.  Burba also testified that he is unable to perform chores at home because he cannot stand long and he cannot sit very long because of his back and legs – he has to rotate between keeping his foot and leg being elevated and bringing them down to keep the circulation.  Tr. 57.  Burba has not been able to perform household chores for about two or three years.  Tr. 67.  In exchange for his brother helping him, Burba provides his brother with free room and board.  Tr. 57.  His brother works at a store down the road from their home.  Tr. 57.  Burba has another brother who lives close by who comes over to snow blow and do repairs at the house.  Tr. 67-68.  Also, Burba has a neighbor who mows the lawn.  Tr. 67.

Burba has a walker that he uses in the shower along with a shower chair so he does not fall and so he has something to hold onto.  Tr. 57.  Burba had been using his walker for showers for about three years because his leg was not healing properly from surgeries.  Tr. 64.  Otherwise, while in his house, Burba uses his cane to get around.  Tr. 63-64.  It takes Burba awhile but he is able to dress himself.  Tr. 57.

Burba indicated that his leg keeps getting worse and worse.  Tr. 57.  He explained that his doctors had tried and recommended an injection in his back but it did not provide any relief.  Tr. 57-58.  His doctor suggested that he try another injection.  Tr. 58.

Burba broke his foot sometime between February and March 2017 and had surgery around March 2017.  Tr. 76, 77.  Burba started receiving short-term disability in March 2017 and permanently stopped working on August 11, 2017.  Tr. 58.  After he started receiving short-term disability,[3] Burba tried to work in June or July – he worked a weekend shift, working half days

---

[3] Burba received short-term disability benefits from March 8, 2017, through May 21, 2017.  Tr. 60.

on Friday, Saturday and Sunday and using vacation time that he had. Tr. 58-59, 66-67. Pain in Burba's legs and foot kept him from being able to perform a whole shift. Tr. 67. He was unable to handle the required standing at his job. Tr. 67. Burba worked a couple of weekends before his employer eventually let him go when Burba brought a cane into work because it was deemed to be a safety/liability issue. Tr. 58-59. Burba does not believe he could perform a sitting-down job because, when he sits, his lower back starts to hurt and he also has to keep his leg elevated. Tr. 67.

During the hearing, Burba alternated between standing and sitting, indicating that, after sitting for about 20 minutes, his back was "killing [him]" and he had to stand to get the blood flowing. Tr. 61. During the hearing, Burba had his walker with him and he was elevating his right leg on it. Tr. 63.

Burba relayed that he had back problems since 2008. Tr. 61. As far as treatment for his back, he recently had an injection and he also has a back brace that he wears every now and then. Tr. 61-62. After hurting his back in 2008, he was able to continue to work for the next eight-plus years. Tr. 62. Burba has swelling in his right knee that is triggered by standing/walking. Tr. 66, 69. Burba estimated being able to stand or walk for a couple of minutes before he needs to rest. Tr. 66. Burba has had a disability placard for a number of years. Tr. 66.

Burba described a typical day for him. Tr. 64. He explained that it takes him about 45 minutes after waking up to get his leg moving. Tr. 64. He is eventually able to slide off his bed and put on his slippers and grab his cane or walker. Tr. 64-65. He then uses the bathroom and his brother fixes him lunch before his brother leaves for work at 11:00 a.m. Tr. 65. Burba's brother works until 3:00 p.m., comes home and checks on Burba, and then returns to work from 6:00 p.m. until 7:00 p.m. to close the store. Tr. 65. Burba explained that he had fallen three

13

times that year – he had his cane with him and his brother was there to pick him up.  Tr. 65.  He had fallen once while trying to rush to the bathroom and he hurt his rib.  Tr. 65.  Burba's primary care physician, who has treated Burba for about four or five years, prescribed a cane for Burba because he was concerned about Burba falling and wanted Burba to use the cane all the time.  Tr. 65, 69.  Before Burba's doctor prescribed the cane, Burba had been using a cane on his own.  Tr. 65.  Burba uses a cane or walker all the time and has for about the last year and a half – since the pain kept getting worse and he was not healing properly from the surgery on his foot.  Tr. 76. Burba's surgeon does not think that there is any further surgery that can be done to correct the problem.  Tr. 76-77.

Burba does not socialize or go out places.  Tr. 72.  He just watches television but sometimes has more recently had problems and blackouts while watching television and has to rewind the show.  Tr. 73.  He has told his physician about them but is not sure why it is happening.  Tr. 73.  Also, Burba's pain is a distraction – it affects his ability to pay attention generally.  Tr. 73.  Burba has a driver's license but has not driven in a year because his leg goes numb and it hurts to try to hold the brake down.  Tr. 75.  He is concerned about causing an accident.  Tr. 75.

Burba 's physician switched him from Vicodin and opioids to 800 mg of Ibuprofen, up to three times each day, for his pain.  Tr. 69-70.  Burba's medications were switched because he had been using narcotics for a long time.  Tr. 70.  With the Ibuprofen, his pain level is at a 7.  Tr. 70.  With the opioids, his pain level was at a 2/3.  Tr. 70-71.  With opioids, he still had swelling and used his walker but he was able to stand for about an hour at a time off and on.  Tr. 71. Burba uses a knee and foot brace.  Tr. 71.  The braces do not help with the pain but they help prevent falls or if he falls the braces soften the landing.  Tr. 71.  Burba has problems sleeping

14

because of his pain so his physician prescribed him sleeping pills.  Tr. 74.  The sleeping pills have helped Burba sleep but he has been having weird dreams.  Tr. 74.  As far as mental health treatment, Burba's primary care physician has given him a prescription for his depression.  Tr. 68.

###       2.       **Vocational expert's testimony**

A Vocational Expert ("VE") testified at the hearing.  Tr. 77-80.  The VE described Burba's past work as a machinist to be a skilled position, generally performed at the medium exertional level but performed by Burba at the light exertional level.  Tr. 78.  The ALJ asked the VE to consider an individual of Burba'a age, education and work experience with the RFC for light work who could climb ramps and stairs frequently; never climb ladders, ropes, or scaffolds; frequently kneel, crouch or crawl; would have to avoid concentrated exposure to hazards such as industrial machinery and unprotected heights; could perform repetitive tasks that are not fast-paced and do not require strict production quotas; and perform tasks in a static setting where changes can be explained in advanced.  Tr. 78-79.  The VE indicated that the described individual would be unable to perform Burba's past work but would be able to perform light, unskilled work with examples being inspector and hand packager; electronic worker; and mail clerk.  Tr. 79.  The ALJ asked the VE whether the identified jobs would remain available if the individual needed to use an ambulatory aid for standing/walking.  Tr. 79.  The VE indicated that the jobs would remain available with that additional limitation because the jobs could be performed sitting or standing.  Tr. 79.

Burba's counsel asked the VE to consider the second hypothetical with an additional limitation of needing to elevate his legs up to waist level.  Tr. 79.  The VE indicated that without

an accommodation there would be no work. Tr. 79-80. The VE reiterated that needing to use a cane or walker would not be an issue with the jobs previously identified. Tr. 80.

The VE indicated that an individual could be off task for up to 15% of an 8-hour workday. Tr. 80. The allowance for absences is no more than two per month. Tr. 80.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her December 20, 2018, decision, the ALJ made the following findings:[5]

1.    Burba meets the insured status requirements of the Social Security Act through December 31, 2021.  Tr. 15.

2.    Burba has not engaged in substantial gainful activity since March 8, 2017, the amended alleged onset date.  Tr. 15.

3.    Burba has the following severe impairments: fracture of the lower extremity; arthritis; obesity; depression; and anxiety.  Tr. 15-16.  Burba had non-severe impairments of esophageal reflux, history of ethanol abuse, and alcoholism in remission and his speech condition, lower disc problems, and complex regional pain syndrome were medically non-determinable conditions.  Tr. 15-16.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[5] The ALJ's findings are summarized.

4.     Burba does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 16-18.

5.     Burba has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except he can frequently climb ramps and stairs, but never climb ladders, ropes, and scaffolds; he can frequently kneel, crouch, and crawl; he must avoid concentrated exposure to hazards such as industrial machinery and unprotected heights; he is able to perform repetitive tasks that are not fast paced and do not require strict production quotas in a static setting where changes can be explained in advance.  Tr. 18-23.

6.     Burba is unable to perform any past relevant work.  Tr. 23.

7.     Burba was born in 1978 and was 39 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 24.

8.     Burba has at least a high school education and is able to communicate in English.  Tr. 24.

9.     Transferability of job skills is not material to the determination of disability.  Tr. 24.

10.    Considering Burba's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Burba can perform, including inspector/hand packager, electronics worker, and mail clerk.  Tr. 24-25.

Based on the foregoing, the ALJ determined that Burba had not been under a disability, as defined in the Social Security Act, from March 8, 2017, through the date of the decision.  Tr. 25.

## V. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      Evaluation of medical opinion evidence for claims filed after March 27, 2017**

Since Burba's claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Rather than the prior framework for evaluation of medical opinions that involved more weight generally being given to opinions from treating sources, i.e., the "treating physician rule," the

19

new regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 115169, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

Further, under the new regulations, administrative law judges "will articulate how [they] considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."  20 C.F.R. § 404.1520c(b)(1).  They "are not required to articulate how [they] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency being the most important factors that are considered.  20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2). Therefore, administrative law judges "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [their] determination or decision."  20 C.F.R. § 404.1520c(b)(2).  The regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence

20

and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). And, the "consistency" factor is explained as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

The regulations provide that, administrative law judges "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."[6] 20 C.F.R. § 404.152c(b)(2). "Additionally, administrative law judges 'must consider' medical findings of non-examining state agency medical or psychological consultants according to the new regulation." *Gower*, 2020 WL 115169, at *4 (citing 20 C.F.R. § 404.1513a(b)(1)).

## C.     The undersigned recommends that the Court AFFIRM the Commissioner's decision

Burba argues that the ALJ did not adequately explain the weight assigned to the medical opinions of his treating physician William Ervine, D.O., as required under the rules and regulations pertaining to claims filed on or after March 27, 2017. Doc. 13, Doc.18. He contends that: (1) the ALJ did not properly explain how persuasive she found Dr. Ervine's opinions to be based on the factors of supportability and consistency and; (2) the ALJ's finding that Dr.

---

[6] However, where administrative law judges find that there are equally persuasive medical opinions or prior administrative medical findings about the same issue but where they are not exactly the same, administrative law judges "will articulate how [they] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in [a claimant's] determination or decision." 20 C.F.R. § 404.1520c(b)(3).

Ervine's opinions are only "partially persuasive" is not supported by substantial evidence.  Doc.

13, pp. 13-17, Doc. 18, pp. 1-4.

### 1. The ALJ did not err in her consideration of Dr. Ervine's opinions

The ALJ discussed Dr. Ervine's opinions and found them to be "partially persuasive,"

stating:

> Treatment records from William Ervine, D.O. repeatedly indicated that the claimant had been provided a disability placard that did not expire to 2020 and he was unable to walk 200 feet without stopping (Exhibits 11F; 16F). Additionally, in June 2018, Dr. Ervine completed a Medical Statement – Physical Limitations/Mental Abilities, an Off-Task/Absenteeism Questionnaire, and a Medical Source Statement – Hand Held Assistive Device (Exhibits 15F; 17F). The doctor noted numerous limitations (Exhibits 15F; 17F).  He indicated that the claimant had severe pain and he believed the claimant could not work more than four hours in a day (Exhibit 15F). Dr. Ervine stated that the claimant would need to elevate his legs above his waist frequently in an eight-hour workday (Exhibit 15F). He concluded that the claimant has needed a single-prong cane to aid in both walking and standing since March 3, 2017 (Exhibit 17F). The physician found the claimant would on average be absent from work more than three times a month because of his impairments or treatment (Exhibit 15F). The undersigned finds these opinions partially persuasive. The doctor's opinion is supported by numerous examinations and treatment notes (Exhibits 2F; 3F; 14F; 19F). However, the doctors' opinions are not fully consistent with his treatment notes. The treatment notes do not indicate[] that the claimant must continue to elevate his leg or use an ambulatory aid and there was no rationale to support a need for these limitations to continue after the claimant recovered from surgery (Exhibits 2F; 3F; 14F; 19F).

Tr. 22.

Burba argues that, while the ALJ considered the supportability factor when weighing Dr.

Ervine's opinions, the ALJ did not properly consider the consistency factor because the ALJ did

not consider the consistency of Dr. Ervine's opinions "with the evidence from ***other*** medical

sources and nonmedical sources in the claim" as required by 20 C.F.R. § 404.1520c(c)(2).  Doc.

13, p. 14 (emphasis in original).  Burba argues that the ALJ's consideration of the consistency

factor was a reconsideration of the supportability factor because the ALJ only looked at Dr.

Ervine's notes, not evidence from other sources.  *Id.*

The undersigned finds that the ALJ's analysis satisfies the requirements of the regulations. While the ALJ's statement regarding consistency of Dr. Ervine's opinions refers to "his" treatment notes, the ALJ's decision as a whole makes clear that the ALJ's analysis took into account treatment records from Dr. Ervine as well as those from other medical sources. For example, the ALJ discussed Dr. Mendeszoon's treatment records and, in light of those records, found that the opinions that Burba would need to indefinitely elevate his leg or use an assistive device were not persuasive, especially in light of Dr. Mendeszoon's statement that Burba could return to light duty work. Tr. 21-22. When discussing the multiple treatment records, the ALJ observed that "physical examinations found the claimant's knee was stable with normal strength and sensation[.]" Tr. 20 (citing Tr. 521 (7/26/2018 treatment note)). Also, the ALJ noted that imaging of Plaintiff's knee in December 2017 showed that degenerative changes and atrophy in Burba's right knee were mild. Tr. 20 (citing Tr. 544 (12/20/2017 MRI)).

In view of the foregoing, the undersigned finds that the ALJ considered and explained the supportability and consistency of Dr. Ervine's opinions as well as the other medical opinions in the record. Furthermore, a review of the decision as a whole makes clear the ALJ's reasons for finding Dr. Ervine's opinion only partially persuasive, which included their lack of consistency with Dr. Ervine's own treatment notes as well as evidence from other medical sources.

## 2. Burba has not demonstrated that the ALJ's finding that Dr. Ervine's opinions are only partially persuasive is not supported by substantial evidence

Burba contends that the ALJ's finding that Dr. Ervine's opinions are only partially persuasive is not supported by substantial evidence because: (1) the rationale is vague because it is not clear which limitations the ALJ found persuasive and which ones she rejected; and (2) the objective evidence of record contained in Dr. Ervine's treatment notes does not show that

23

Burba's issues with standing and walking improved after he recovered from his surgeries.  Doc. 13, pp. 15-17.

Burba has not shown that the ALJ's failure to specifically identify which limitations were accepted or rejected demonstrates that the ALJ's finding that Dr. Ervine's opinions were only partially persuasive is unsupported by substantial evidence.  The ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*  And, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).  Furthermore, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014).

Burba's claim that the ALJ's decision is not supported by substantial evidence because the objective evidence of record contained in Dr. Ervine's treatment notes does not show that

Burba's issues with standing and walking improved after he recovered from his surgeries amounts to a request that the Court try the case de novo.  However, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Moreover, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Here, the ALJ did not ignore evidence.  The ALJ considered the entirety of the record, including evidence that Burba cites to in support of her position, e.g., abnormal gait, with limping to the right; crepitus in the knee; tenderness to palpation over the right knee; use of TENS unit; use of cane, (Tr. 20), but concluded that Burba's impairments were not as disabling as Burba alleged.  As noted by the ALJ, after Burba's foot surgery, Dr. Mendeszoon in May 2017 authorized Burba's return to light duty work.  Tr. 21.  Physical examination findings showed normal stability, strength and sensation.  Tr. 21.  Additionally, the ALJ considered other medical opinion evidence, including the opinions of the state agency consultants who considered the record evidence, including evidence regarding Burba's foot and knee, and concluded that Burba had the RFC to perform light work with postural and environmental limitations.  Tr. 23. Furthermore, even if there is evidence to support a need for Burba to need an assistive device following his surgery, the VE indicated that such a limitation would not preclude an individual with Burba's RFC from performing the jobs the VE identified.  Tr. 79, 80.

Based on the foregoing, the undersigned finds that Burba has not shown that the ALJ's discussion of Dr. Ervine's opinions is not supported by substantial evidence.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

May 1, 2020                                    */s/ Kathleen B. Burke*
                                               Kathleen B. Burke
                                               United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).